UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GARRY ANDREANO,

                Plaintiff,

     -against-

NBTY MANUFACTURING NEW YORK, INC.,

            Defendant.

Civil Action No.
15-CV-00867
(LDW)(AKT)

---

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

Amy Ventry-Kagan
Kelly C. Spina
**LITTLER MENDELSON, P.C.**
290 Broadhollow Road, Suite 305
Melville, NY  11747
(631) 247-4700
aventry@littler.com
kspina@littler.com
*Attorneys for Defendant*

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ........................................................................ 1

I.      THE PARTIES.............................................................................. 1

II.     PLAINTIFF WAS COMPENSATED CONSISTENT WITH HIS EXEMPT
        STATUS ....................................................................................... 3

III.    PLAINTIFF WAS PRIMARILY RESPONSIBLE FOR MANAGERIAL
        DUTIES ....................................................................................... 4

PROCEDURAL HISTORY...................................................................... 5

ARGUMENT ........................................................................................... 6

I.      SUMMARY JUDGMENT STANDARD ...................................... 6

II.     PLAINTIFF WAS PROPERLY CLASSIFIED AS EXEMPT UNDER THE
        EXECUTIVE EXEMPTION OF THE FLSA AND NYLL ............... 7

        A.      Plaintiff Was Paid on a Salary Basis..................................... 8

        B.      Plaintiff's Primary Duty Was Management of a Department or
                Subdivision ........................................................................... 9

                1.      Plaintiff's Management of His Packaging Unit Was, by Far, the
                        Most Important Duty He Performed ...................................... 11

                2.      Plaintiff Spent Most of His Time Performing Management Work.......... 15

                3.      Plaintiff Was Relatively Free From Direct Supervision ......................... 18

                4.      Plaintiff's Compensation Significantly Exceeded That of His
                        Subordinates.......................................................................... 20

        C.      Plaintiff Customarily and Regularly Directed the Work of Two or More
                Other Employees..................................................................... 21

        D.      Plaintiff's Suggestions and Recommendations as to Hiring, Firing,
                Advancement, Promotion and/or Other Employee Status Changes Were
                Given Particular Weight ......................................................... 22

CONCLUSION........................................................................................ 25

i.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amash v. Home Depot U.S.A., Inc.*,
  24 F. Supp. 3d 214 (N.D.N.Y. 2014) ........................................................8, 19, 21

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................6, 7

*Baldwin v. Trailer Inns. Inc.*,
  266 F.3d 1104 (9th Cir. 2001) ........................................................................18

*Beauchamp v. Flex-N-Gate LLC*,
  357 F. Supp. 2d 1010 (E.D.Mich. 2005)...................................................24, 19

*Bell v. Callaway Partners, LLC*,
  394 F.App'x 632 (11th Cir. 2010) ..................................................................9

*Burson v. Viking Corp.*,
  661 F. Supp. 2d 794 (N.D. Ohio 2009).............................................................19

*Calvo v. B&R Supermarket, Inc.*,
  63 F. Supp.3d 1369 (S.D. Fla. 2014) ..............................................................24

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)....................................................................................6

*Donovan v. Burger King*,
  675 F.2d 516 (2d Cir. 1982)..........................................................................17

*Garrison v. Conagra Foods Packaged Foods, LLC*,
  2015 WL 366431 (E.D. Ark. Jan. 6, 2015).......................................................24

*Havey v. Homebound Mortgage, Inc.*,
  547 F.3d 158 (2d Cir. 2008)...........................................................................9

*Jones v. Va. Oil Co., Inc.*,
  69 Fed. App'x 633 (4th Cir. 2003) ..................................................................18

*Kastor v. Sam's Wholesale Club*,
  131 F. Supp. 2d 862 (N.D. Tex. 2011) .............................................................20

*Mullins v. City of New York*,
  523 F. Supp. 2d 339 (S.D.N.Y. 2007)..............................................................17

*Murray v. Stuckey's, Inc.*,
  939 F.2d 614 (8th Cir. 1991) ....................................................................18, 20

*Rainey v. McWane, Inc.*,
    552 F. Supp. 2d 626 (E.D. Tex. 2008) ................................................................19

*Ramos v. Baldor Specialty Foods, Inc.*,
    687 F.3d 554 (2d Cir. 2012) .......................................................................10

*Scott v. SSP Am., Inc.*,
    2011 WL 1204406 (E.D.N.Y. Mar. 29, 2011) ................................................17, 23

*Sista v. CDC Ixis N. Am., Inc.*,
    445 F.3d 161 (2d Cir. 2006) .........................................................................6

*Snipes v. Ne. Pharms.*,
    2013 WL 757628 (M.D. Ala. Feb. 27, 2013) ......................................................9

*Yesmin v. Rite Aid of New York, Inc.*,
    2012 WL 3871735 (E.D.N.Y. Sept. 6, 2012) ...................................................8, 17

**STATUTES**

29 U.S.C. § 207(a)(1) ...................................................................................7

29 U.S.C. § 213(a)(1) ...................................................................................7

**OTHER AUTHORITIES**

29 C.F.R. § 541.100(a) ........................................................................8, 9, 21, 22

29 C.F.R. §541.103(a) ................................................................................10

29 C.F.R. § 541.105 ..................................................................................22

29 C.F.R. § 541.106 ..................................................................................16

29 C.F.R. §§ 541.600, 602 .............................................................................9

29 C.F.R. § 541.604(a) .................................................................................9

29 C.F.R. § 541.700(a) .....................................................................10, 11, 20, 21

29 C.F.R. § 541.704 ..................................................................................20

12 N.Y.C.R.R. § 142-2.2 ................................................................................7

12 N.Y.C.R.R. § 142-2.14(c)(4)(i) ........................................................................8

F.R.C.P. 56 ............................................................................................6

## PRELIMINARY STATEMENT

NBTY Manufacturing NY, Inc. ("NBTY" or the "Company"), by and through its attorneys Littler Mendelson, P.C., hereby submits this Memorandum of Law in support of NBTY's Motion for Summary Judgment.  By its motion, NBTY seeks dismissal of Plaintiff Garry Andreano's ("Plaintiff") Amended Complaint (the "Complaint"), in its entirety, pursuant to Federal Rule of Civil Procedure 56.

Plaintiff is a former packaging supervisor at NBTY who alleges he was misclassified as exempt and not paid overtime compensation, in violation of the federal Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").  NBTY categorically denies that Plaintiff was improperly classified.  Instead, as a well-compensated packaging supervisor responsible for a discrete unit of packaging employees, Plaintiff was exempt from any overtime requirements and fell well within the parameters of the executive exemption as applied under the FLSA and NYLL.  Since the undisputed evidence in this case establishes all the requisite elements to support that Plaintiff was properly classified as exempt, summary judgment in favor of Defendant should be granted in full.

## STATEMENT OF FACTS[1]

### I.    THE PARTIES

NBTY is a manufacturer and distributor of vitamins and nutritional supplements.  It maintains its world headquarters in Ronkonkoma, New York (on Long Island) and also has manufacturing and warehouse facilities in nearby Bohemia where Plaintiff worked as a packaging supervisor.

At all times relevant to this action, NBTY's packaging operations encompassed nearly an

---

[1]    NBTY also refers the Court to its Rule 56.1 Statement of Undisputed Material Facts ("56.1") to which this summary is intended to be a supplement.

entire building that was larger than a football field and included 21 packaging assembly lines and additional boxing lines.  It ran on a 24/7, 5-day a week schedule to bottle, box, or otherwise package hundreds of millions of vitamins and supplements every month.  Weekend shifts were sometimes added as required by business needs.  Overseeing the packaging department staff of approximately 460 employees was a plant manager and three or four assistant managers.  Reporting to the assistant managers were, during the relevant time period, approximately 15 packaging supervisors.  Each packaging supervisor was, in turn, responsible for directly supervising the packaging employees within his assigned unit.  These front-line packaging employees (referred to by the Company as "associates") were the individuals directly responsible for bottling and/or packaging the vitamins and supplements that were manufactured by the Company.  Those assigned to work directly on, or to support, the packaging lines held the following positions: line runner, catcher, material handler, lead, planner and job checker.

Each packaging supervisor, including Plaintiff, was responsible for overseeing the entire packaging process on his shift for his respective unit.  Each unit typically comprised four separate packaging lines.  As a packaging supervisor, Plaintiff supervised at least a dozen packaging employees on these lines.  These packaging associates were essentially responsible for:  bringing the loose pills, tablets or capsules to the packaging line; running the machines that placed the correct type and quantity of product in the proper packaging and applied a label containing the required nutritional information and lot number; operating machines that boxed the product; and transferring the products from the packaging department to quality assurance for a final review before distribution.  Plaintiff assigned and oversaw the work of these packaging associates, made staffing decisions, coached and counseled, responded to questions and problems as they arose, addressed performance issues and disciplined associates as needed, made hiring

and termination recommendations, conducted training, and performed accident investigations, among other things.

## II.      PLAINTIFF WAS COMPENSATED CONSISTENT WITH HIS EXEMPT STATUS

As a packaging supervisor, Plaintiff was treated as exempt under the executive exemption of the FLSA and the NYLL.  In this respect, Plaintiff was paid an annual salary of approximately $80,000 per year, at a fixed weekly rate of approximately $1,400, which was well above the minimum salary of $455 and $600 per week required by the FLSA and NYLL, respectively. Moreover, Plaintiff was paid far in excess of those who reported to him.  By way of example, a starting catcher who was responsible for "catching" the full bottles on the assembly line and placing them in boxes typically earned $8.99 per hour (or $18,699.20 annually assuming 40 hour workweeks).

Plaintiff was expected to work a 45-hour workweek and his fixed weekly salary was intended to, and did, cover those 45 hours.  Plaintiff's weekly pay was not subject to deductions based on the quality or quantity of work he performed.  For example, if Plaintiff took a half day because he was sick, he was required to utilize sick time but was not deducted any pay.

While NBTY considered Plaintiff to be exempt under the FLSA and NYLL, the Company did provide him and other packaging supervisors the opportunity to earn additional compensation.  In this respect, if a packaging supervisor such as Plaintiff worked beyond the regular 45-hour workweek, he or she was entitled to receive additional compensation for each hour above 45 hours worked.  Paying additional compensation to exempt employees, even when it is paid based on hours worked, is expressly permitted under the FLSA and does not jeopardize the exempt status of an otherwise properly classified employee.

## III.   PLAINTIFF WAS PRIMARILY RESPONSIBLE FOR MANAGERIAL DUTIES

During the relevant time period, Plaintiff was responsible for supervising two different packaging units, each of which played a specialized role in readying mass quantities of NBTY's products for distribution.  On a daily basis, Plaintiff supervised at least a dozen associates, all of whom were non-exempt, hourly employees.  In doing so, he was responsible for directly supervising the work performed by these non-exempt employees to ensure that the end product was completed to Company standards and in conformity with the work orders they were given.

Plaintiff began his shift a half hour before his associates were scheduled so that he could meet with the outgoing shift supervisor, ascertain what transpired on the prior shift, and assess the available staff and needs for his shift.  Plaintiff would also participate in management-only meetings and then conduct a pre-shift meeting with his staff to relay any critical information such as high priority work orders or new Company policies and procedures.

During his regular shift, Plaintiff would oversee his staff to ensure they were performing their tasks as required and in conformity with good manufacturing practices.  Associates would come to Plaintiff as the first point of contact for questions as varied as ensuring the packing process was running correctly, addressing any issues with the operation of the machines, payroll issues, and time off requests.  Plaintiff testified that, because he had a solid, experienced staff, he had few issues with their performance; however, he also testified that if he did have issues, he was responsible for drafting and issuing disciplinary notices or making recommendations to terminate employment.  Plaintiff was also responsible for monitoring the time and attendance of his associates and would have to address any issues of tardiness or absences.  He was also expected to review and approve his associates' overtime hours and address any instances of unauthorized overtime worked.

In addition to the permanent staff he supervised, Plaintiff also oversaw a significant

number of temporary workers.  When new temporary workers arrived, Plaintiff was responsible

for showing them around and assigning them to work with more experienced team members for

hands-on training.  Plaintiff would always oversee this training and step in to correct any issues

he observed.  If Plaintiff felt the temporary employee was not working out then it was within his

unilateral authority to terminate him or her and request a replacement.  On the other hand, when

a temporary employee performed well, Plaintiff could and did recommend that person for

permanent employment.

If an employee became permanent (whether through a temporary assignment or outside

recruiting), the new hire would undergo a probationary period in which Plaintiff would evaluate

his/her performance to ensure he/she was performing the job appropriately.  If Plaintiff felt there

was a problem, he would complete a written probationary evaluation to document his concerns.

Alternatively, if Plaintiff felt the employee was performing satisfactorily then, in his discretion,

he would not complete the evaluation form.  Plaintiff was always evaluating the performance of

his team and, if he felt an employee was performing particularly well then Plaintiff could, and

did, make a recommendation for Employee of the Month recognition.

The record evidence in this case makes it clear that, as a packaging supervisor, Plaintiff

was properly classified as exempt under the executive exemption of the FLSA and the NYLL.

Accordingly, and for all of the reasons set forth in detail below, summary judgment in favor of

NBTY should be granted on all claims, and the Complaint should be dismissed in its entirety.

## PROCEDURAL HISTORY

Plaintiff filed a Complaint on or about February 18, 2015 (a week after he was terminated

by the Company) alleging claims for unpaid overtime under the FLSA and NYLL.  Ex. 1.[2]  On

---

[2]      All exhibits referenced herein are annexed to the accompanying Declaration of Kelly C.
Spina dated March 15, 2016 or otherwise submitted under seal in accordance with the parties'

5

or about June 8, 2015, Plaintiff filed an Amended Complaint expanding the factual allegations in support of these claims.  Ex. 2.  Thereafter, on or about June 22, 2015, NBTY filed an Answer to the Amended Complaint With Affirmative Defenses.  Ex. 3.

The parties exchanged written discovery and conducted depositions.  NBTY deposed Plaintiff on November 6, 2015.  Plaintiff deposed warehouse manager Cheryl Alker on November 30, 2015, team leader Haiding Diaz on December 2, 2015, former business unit manager Stephen Harrington on December 9, 2015, and HR business partner Zoraida Lopez on December 21, 2015.  With the completion of all fact discovery, the Company now moves for summary judgment on the ground that Plaintiff's misclassification claim under the FLSA and NYLL fails as a matter of law.

## ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to dispose of meritless claims before engaging in a costly trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Rule 56(c) of the Federal Rules of Civil Procedure that requires summary judgment be entered if the evidence demonstrates "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [fact finder] could return a verdict for the nonmoving party.'"  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

Stipulation of Confidentiality and Protective Order dated June 8, 2015 and So-Ordered by Magistrate A. Kathleen Tomlinson on June 11, 2015.

that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

Where, as here, there is no issue for trial, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.  Because the overwhelming record evidence in this case, as demonstrated by Plaintiff's own documents and testimony, makes it crystal clear that he was properly classified as exempt from overtime under the FLSA and NYLL, NBTY's motion for summary judgment should be granted in full.

## II.   PLAINTIFF WAS PROPERLY CLASSIFIED AS EXEMPT UNDER THE EXECUTIVE EXEMPTION OF THE FLSA AND NYLL

Subject to certain exceptions, the FLSA and NYLL require an employee to be paid at a rate not less than one and one-half times the employee's regular rate of pay for each hour worked over 40 hours in a given workweek.  29 U.S.C. § 207(a)(1); N.Y. Lab. Law §§ 650 et seq.; 12 N.Y.C.R.R. § 142-2.2 (expressly adopting the provisions and exemptions of the FLSA).  One of the exceptions to this requirement is the so-called "executive exemption".  29 U.S.C. § 213(a)(1); N.Y. Lab. Law § 651(5)(c).

An individual is "employed in a *bona fide* executive capacity" if:

(1) he is compensated by a salary of at least $455 per week under the FLSA (and more than $543.75 per week under the NYLL[3]);

(2) his primary duty is managing the employer's enterprise or a customarily recognized department or subdivision thereof;

(3) he customarily and regularly directs the work of two or more other employees; and

(4) he has the authority to hire or fire other employees or his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

---

[3]      This limit was increased to $600.00 per week under the NYLL effective January 1, 2014.

29 C.F.R. § 541.100(a); 12 N.Y.C.R.R. § 142-2.14(c)(4)(i); *see also Yesmin v. Rite Aid of New York, Inc.*, No. 10-cv-4157, 2012 WL 3871735, at *4 (E.D.N.Y. Sept. 6, 2012) (analyzing these factors to find that a co-manager was exempt from the FLSA's overtime requirements as a matter of law)*; Amash v. Home Depot U.S.A., Inc.*, 24 F. Supp. 3d 214, 218 (N.D.N.Y. 2014) (recognizing that, "[w]ith the exception of the required minimum salary, New York's Codes, Rules and Regulations mirror the United States Department of Labor's definition of an 'executive' employee").

The undisputed facts in this record establish that the terms and conditions of Plaintiff's employment with NBTY satisfy each of the four requirements for the executive exemption. Therefore, NBTY is entitled to judgment as a matter of law and the Complaint should be dismissed in its entirety.

### A.    PLAINTIFF WAS PAID ON A SALARY BASIS

There can be no dispute that NBTY satisfied the salary basis test under both the FLSA and the NYLL.  29 C.F.R. § 541.100(a)(1).  During his employment, Plaintiff was paid a fixed salary well in excess of the minimum $600 per week for all hours worked, which was typically a 45-hour workweek.  56.1, ¶¶ 64, 69.  In fact, Plaintiff's annual salary at the time of his termination was $83,856 and Plaintiff estimates that his weekly salary averaged $1,400 per week during the last six years of his employment.  56.1, ¶¶ 66, 70.  Plaintiff acknowledged his status as a salaried, exempt employee in his Wage Theft Prevention Act notification forms.  Ex. 29.  This salary was not subject to any improper reductions meaning, for example, if Plaintiff worked less than 45 hours in a workweek, he still received his base weekly salary.  56.1, ¶¶ 63, 68.

Moreover, while NBTY paid Plaintiff additional compensation for hours worked beyond 45 in a workweek, this fact does not in any way undermine the conclusion that he was paid on a salary basis.  Indeed, the FLSA regulations explicitly recognize this practice as permissible:  "the

exemption is not lost if an exempt employee who is guaranteed at least $455 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek." 29 C.F.R. § 541.604(a); *see also Havey v. Homebound Mortgage, Inc.*, 547 F.3d 158, 165-66 (2d Cir. 2008) (upholding employer's "two part salary scheme" where employee was guaranteed a minimum salary of $48,000 and then paid additional prospective quarterly bonuses which could be reduced if he did not meet performance goals); *Bell v. Callaway Partners, LLC*, 394 F.App'x 632 (11th Cir. 2010) (affirming summary judgment to employer where it provided bookkeeper/accountants with a guaranteed weekly salary and, as an incentive to work additional hours, a "bonus" calculated at a straight-time hourly rate for additional hours worked); *Snipes v. Ne. Pharms.*, No. 11-cv-1000, 2013 WL 757628, at *6 (M.D. Ala. Feb. 27, 2013) (granting summary judgment to employer on overtime claims premised upon employee's receipt of straight pay hourly wages in addition to guaranteed salary for hours worked in excess of the employee's anticipated weekly hours).

Accordingly, the evidence is undisputed that Plaintiff meets all of the "salary basis" requirements to satisfy the first element of the executive exemption. 29 C.F.R. §§ 541.600, 602 ("An employee will be considered to be paid on a 'salary basis'… if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed").

### B.   PLAINTIFF'S PRIMARY DUTY WAS MANAGEMENT OF A DEPARTMENT OR SUBDIVISION

To further qualify as a *bona fide* executive, an employee's primary duty must be the management of an enterprise or of a customarily-recognized department or subdivision thereof. 29 C.F.R. § 541.100(a)(2). The regulations define a "department or subdivision" as any "unit

with permanent status and a continuing function." 29 C.F.R. §541.103(a).  There can be no dispute that Plaintiff supervised a permanent and identifiable department or subdivision associated with the packaging process, whether it be the four packaging lines of Unit 3 or the packing and boxing lines of Unit 5.  56.1, ¶¶ 17-19.  Even before the creation of this unit structure, Plaintiff's supervision of these numerous packaging lines likewise constituted the supervision of an identifiable department or subdivision.  *See, e.g., Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 561-64 (2d Cir. 2012) (a team of "pickers" who retrieved food from warehouse shelves constituted a "department or subdivision" even though other teams performed the same tasks at the same time).

Pursuant to Department of Labor regulations, the term "primary duty" refers to the "principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Employees who are classified as exempt executives must have "management" as their "most important duty."  *Id.*  The regulations identify factors to consider in analyzing whether "management" qualifies as a plaintiff's primary duty, including: (1) the relative importance of their exempt "management" duties as compared to other duties they may perform; (2) the amount of time spent performing exempt "management" work; (3) their relative freedom from direct supervision on the job; and (4) the relationship between a plaintiff's salary on the one hand, and the wages paid to other employees for the kind of non-exempt work performed by Plaintiff, on the other.  *See* 29 C.F.R. § 541.700(a).  None of these factors is singularly determinative because, at its core, the primary duty analysis is based on the totality of the circumstances, "with the major emphasis on the character of the employee's job as a whole."  *Id.*  Upon applying these factors to the undisputed record facts in this case, it is patently clear that Plaintiff's "primary duty" as a packaging supervisor was undeniably the management of an

10

NBTY "department or subdivision" so as to meet this requirement of the executive exemption.

**1.      Plaintiff's Management of His Packaging Unit Was, by Far, the Most Important Duty He Performed**

As noted above, "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  In his role as packaging supervisor, NBTY expected, indeed needed, Plaintiff to manage his unit as an integral component of the overall manufacturing, packaging and distribution process.  The record in this respect is clear that Plaintiff's primary role was to manage and oversee the day-to-day operations of his designated packaging lines. This included the supervision of at least a dozen employees and coordination of the packaging process so as to minimize downtime and maximize output on multiple packaging lines each running work orders for tens of thousands of vitamins/supplements to be packaged per shift. 56.1, ¶¶ 7-8, 19.  While the assistant managers were responsible for indirect oversight of multiple packaging lines across all shifts, Plaintiff was individually responsible for the management of all employees working on his lines during his shift and was the first point of contact for each of these associates.  56.1, ¶¶ 12-14.

The job description for a packaging supervisor such as Plaintiff fully supports the fact that his primary duty was management of his packaging unit:

- Identifies issues effecting efficiencies and assists in developing solutions
- Monitors productivity and motivates associates in production and/or distribution areas
- Ensures that all paperwork is properly documented
- Keeps accurate attendance records; files proper reports (accident, probation, etc.)
- Supervises, counsels and coaches associates on a regular basis
- Complies with company policies and procedures and maintains regular work attendance
- Personal responsibility for following safety rules, SOPs and GMPs guidelines
- Performs other duties as assigned

Ex. 10.  Moreover, when hiring to fill this position, NBTY explicitly required "[p]rior supervisory experience in a manufacturing and/or warehouse environment" as the very first requirement of the position thus demonstrating that the most critical component of the position was supervision.  *Id.*

Plaintiff's own testimony and documents reflect that he was, at all times, a supervisor. 56.1, ¶¶ 19, 31, 52.  Plaintiff was required to come in approximately a half hour before his subordinates in order to perform managerial functions, such as reviewing the outgoing shift's performance, identifying any equipment or staffing issues, and attending management meetings. 56.1, ¶¶ 38-39.  During these management meetings, Plaintiff was expected to raise any staffing issues on his unit and locate potential replacements.  56.1, ¶ 38, 51; Exs. 19, 22, 23.  Plaintiff was also responsible for monitoring the time and attendance of his associates, including the review and approval of their weekly time cards.  56.1, ¶¶ 49-50.  If Plaintiff observed any issues with absenteeism, tardiness or unauthorized overtime then he was responsible for addressing those issues with the associate.  56.1, ¶ 50.

Once his associates arrived, Plaintiff conducted a pre-shift meeting with the team to discuss the expectations for that day and go over any issues of importance such as new company policies and procedures, safety issues, or high priority work orders.  56.1, ¶ 40.  Plaintiff would have to decide how many employees to use on each line depending upon the work orders he had for a particular day so as to "utilize the people the best way possible for each day".  56.1, ¶ 41 (Andreano Tr., p. 106).  If his associates had questions, they could raise them with Plaintiff during this meeting or at any time during their shift.  56.1, ¶ 47.  For example, associates might have questions about a particular machine, a product that is being run, their work schedule or their paycheck, each of which should be brought to Plaintiff's attention for resolution or further

12

action as he deemed appropriate.  56.1, ¶¶ 47-48.

Once his subordinates were working, Plaintiff was the front line supervisor who was responsible for personally addressing issues that arose on the various packaging lines he was in charge of or, if necessary, reaching out to appropriate personnel, such as mechanics, quality assurance, or upper management to keep the associates and machinery in his unit performing safely and efficiently.  56.1, ¶¶ 47-48.   This critical role required immediate and sound judgment and discretion far different from the rank and file tasks of those who Plaintiff supervised.  As Plaintiff testified:

> Q.     If somebody came to you with an issue or a question, you would go over to the line to look at the situation?
>
> A.     Right.
>
> Q.     If you could resolve it yourself, you would do that, right?
>
> A.     Yes.
>
> Q.     And then if you needed somebody else's input, then you would make that decision to call.  Who would you call?
>
> A.     Depending on what the situation was, it could be a mechanic, it could be a QA or it might be one of the managers if it is something that needs to be escalated.

Andreano Tr., p. 86.  If a line required his personal assistance, Plaintiff would sometimes lend a hand in order to keep the production moving along.  56.1, ¶52.  Even when he did so, he retained primary responsibility for overseeing the production in his areas, including responsibility for ensuring that all of his employees were performing properly.  *Id.*  When his associates completed their assigned task, Plaintiff was responsible for reviewing the work order and the product to ensure that the packaging was done correctly and the paperwork was completed accurately.  56.1, ¶¶ 43, 45, 46.  Plaintiff would have to take appropriate action if something was incorrect, which might include discipline for an associate error.  56.1, ¶¶ 43, 45, 45, 56; Ex.16.

13

Plaintiff was required to multi-task in the fast-paced, high-volume packaging operations as he was the go-to person, for example, to review the department's output, complete supervisory paperwork and reports, and respond to personnel issues. 56.1, ¶¶ 7, 27, 47, 48, 58. At the conclusion of the shift, Plaintiff was required to remain for an additional half hour to oversee a smooth transition to the next shift. 56.1, ¶ 53. His subordinates, however, simply punched out and went home. *Id.*

Each of these facts makes clear that Plaintiff retained supervision as his primary duty throughout the entirety of his shift. Indeed, Plaintiff's own resume lists the first of ten responsibilities as an NBTY supervisor as "[e]fficiently supervise the complete spectrum of comprehensive dietary supplement packaging operations…" and the cover letter accompanying that resume indicates that his "qualifications include significant experience in the supervising high-volume packaging operations". Ex. 13. In order to perform these supervisory functions, Plaintiff had a designated workspace on the packaging floor as well as a separate cubicle away from the floor. 56.1, ¶ 62. His associates, on the other hand, did not have such a workspace and were only responsible for duties related to the packaging lines themselves. *Id.*

If Plaintiff was busy with supervisory duties, he could delegate oversight of the packaging line to a line lead but that person could not approve associate time entries, coach and counsel, or complete incident reports. 56.1, ¶ 27. The fact that Plaintiff was required to personally perform these duties is reflective of the heightened level of responsibility he possessed as the supervisor of his unit. Having a lead available allowed Plaintiff to focus on shift planning and preparation while the lead could be more hands-on with checking jobs. *Id.* Plaintiff's deposition testimony acknowledged that he was the person ultimately responsible for the performance of his team:

14

- "I was in control of my area so it [evaluating employee performance] would be my responsibility.   If someone wasn't doing their job for whatever reason, I would have to answer that".  Andreano Tr., p. 36;

- "If it [employee training] wasn't getting done properly, I'm going to be held responsible".  Andreano Tr., p. 38;

- "To the best of my ability, I tried to oversee everything". Andreano Tr., p. 41;

- "Whenever somebody needed something on the line, I was there to fulfill whatever needs they are".  Andreano Tr., p. 289.

Under these circumstances, it is clear that Plaintiff's most important duties at NBTY were managerial in nature.  While Plaintiff may try to downplay his key management role in the Company's manufacturing and distribution of hundreds of millions of vitamins and supplements per month, his testimony, as reflected above and in Defendant's 56.1 Statement, belies those efforts.  Also undermining any claim that he did not function as a true supervisor is his very own resume which was prepared outside the context of this litigation and speaks to the true nature and importance of his duties as a packaging supervisor.

The undisputed documentary evidence along with Plaintiff's testimony confirms that Plaintiff spent the majority of his time performing managerial duties and that these duties were, at all times, his primary duties.  No one else at the Company was in a position to directly supervise the packaging associates and, without Plaintiff, his packaging lines could not run in the safe and efficient manner required to meet the product demands by NBTY's customers.  As such, there can be no genuine dispute that Plaintiff's primary responsibilities were always management.

## 2.    Plaintiff Spent Most of His Time Performing Management Work

Plaintiff's deposition testimony makes clear that he spent the majority of his time

performing management work.  As noted above, he was responsible for spending a half hour before his associates arrived to prepare for the shift as well as another half hour at the end of the shift to facilitate the transition to the next shift.  Meanwhile, during the shift Plaintiff was responsible for overseeing everything that transpired on his lines, including a review of the work orders and product,  training, evaluation of employee performance and addressing any performance issues, reviewing and approving employee time records, obtaining and/or releasing temporary workers, and the like.  56.1, ¶¶ 33-37, 43-51, 54-60.  Plaintiff attempts to minimize the scope of his managerial functions by suggesting that he was merely following direction, but the direction he was given was to supervise his unit:

> Q.     While you may be doing some of these other things, helping the packaging lines move, you're the one who is responsible for making everything work and for making sure all the employees are doing what they are supposed to be doing, correct?
>
> A.     According to management, yes.
>
> Q.     Well, according to you are your job responsibilities, right?
>
> A.     Yes, I'm doing what I'm told.
>
> Q.     But that's your job, to make sure everything is running, make sure the employees are doing their job, make sure the packing lines keep running?
>
> A.     Yes.

Andreano Tr., pp. 300-301.  To the extent Plaintiff may have performed non-exempt production work during a shift, this was done at his discretion in order to meet goals for his unit as he saw fit in light of available staffing and other factors.  56.1, ¶ 52.  Even while doing so, Plaintiff admits he always retained his managerial responsibilities.  *Id.*  In any event, FLSA regulations explicitly recognize that the performance of non-exempt duties by an exempt employee does not automatically destroy the employee's exemption status.  29 C.F.R. § 541.106 ("[c]oncurrent

performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met").

The Second Circuit has expressly recognized that, while supervisors such as Plaintiff may often be required to lend an "extra hand", they will nonetheless retain managerial responsibility as their primary duty.  *Donovan v. Burger King*, 675 F.2d 516, 520 (2d Cir. 1982) (assistant managers were properly exempt even where their exercise of discretion was "circumscribed by prior instruction"); *see also Yesmin*, 2012 WL 3871735, at *4, 6 (a drugstore "co-manager" who was charged with cleaning bathrooms, sweeping sidewalks, wiping windows, moving merchandise, organizing magazines on shelves and crushing boxes in addition to her supervisory responsibilities was nonetheless an executive exempt employee whose primary duty was management); *Scott v. SSP Am., Inc.*, No. 09-cv-4399, 2011 WL 1204406, at *4 (E.D.N.Y. Mar. 29, 2011) (upholding executive exemption of a unit manager of a food and beverage services vendor at JFK Airport even though she testified to spending more than 90 percent of her time performing non-exempt work); *Mullins v. City of New York*, 523 F. Supp. 2d 339, 357 (S.D.N.Y. 2007) (the fact that the police sergeant plaintiffs worked alongside their subordinates and performed many of the same tasks did not override the fact that they were simultaneously tasked with supervisory responsibility).

To the extent Plaintiff claims that he was often required to work the packaging lines that he supervised, courts have routinely found that an employee's "primary duty" remained managerial even where it comprised only a small portion of his or her day.  *See*, *e.g.*, *Scott v. SSP America, Inc.*, 2011 WL 1204406, at *8 (E.D.N.Y. Mar. 29, 2011) (granting summary judgment to employer despite plaintiff's claim that  90 percent of time was spent performing nonexempt tasks; exempt work plaintiff did perform was more important to success of business); *Donovan v.*

*Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982) (assistant managers who spent at least half their time on non-exempt duties were still overtime exempt); *Jones v. Va. Oil Co., Inc.*, 69 Fed. App'x 633, 637 (4th Cir. 2003) (plaintiff was deemed overtime exempt where record reflected that she could simultaneously perform management tasks such as "supervision of employees" along with "complet[ing] daily paperwork"); *Baldwin v. Trailer Inns. Inc.*, 266 F.3d 1104, 1113 (9th Cir. 2001) (employees were exempt executives even though they spent the majority of their time on non-exempt work); *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 618 (8th Cir. 1991) (gas station managers were exempt from overtime even though they spent 65- 90 percent of their time performing non-managerial functions).

Accordingly, even if this Court accepts as true Plaintiff's transparently downplayed portrayal of his supervisory responsibilities, it would not alter NBTY's entitlement to summary judgment.  The fact remains that Plaintiff's *primary and most important duty* was always the management of his unit – including the supervision of at least a dozen employees and oversight of the high volume packaging process – regardless of any particular task (managerial or non-managerial) that he handled at any given moment.  The case law discussed above makes clear that, even where Plaintiff performed non-exempt work to further his unit's production goals, he was still properly classified as exempt because he always retained management responsibility.

### 3.  Plaintiff Was Relatively Free From Direct Supervision

It is undisputed that Plaintiff was the direct point of contact for his associates and was responsible for the direct oversight of these employees on a daily basis throughout his shift.  This included, among other things, training on manufacturing practices and standard operating procedures, answering employee questions on the use of machinery, and evaluating and correcting work performance.  56.1, ¶¶ 33-34, 47-48, 54.  Plaintiff was also the person responsible for coaching and counseling his associates, preparing incident reports, documenting

18

employee transfers, and reviewing and approving associate time entries, none of which could be delegated to the quasi-supervisory line lead who reported to Plaintiff.  56.1, ¶ 27.  Plaintiff even received comprehensive supervisory training on how to handle various workplace situations, including coaching and counseling, conflict management, and problem analysis and solution, with the expectation that Plaintiff would address issues within his team as they arose.  56.1, ¶ 30; Ex. 12.

"Nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an 'executive'." *Beauchamp*, 357 F. Supp. 2d at 1017.  Instead, a supervisor need only be *relatively* free from direct supervision, which may be satisfied even where a supervisor lacks the independent authority to make material determinations.  *See*, *e.g.*, *Amash*, 24 F. Supp. 3d at 221 (assistant store manager had relative freedom from upper management even where he "needed approval from his store manager" before any "significant management decision had to be made").  Likewise, a supervisor who follows his employer's established guidelines for training, discipline, and evaluations is no less a manager because he utilized standard forms or practices, which is common of many large companies.  *Burson v. Viking Corp.*, 661 F. Supp. 2d 794, 802 (N.D. Ohio 2009) (finding that a production shift supervisor was still exempt even though he claimed that the safety training he provided to his press operators were dictated by company policy and he did not have the authority to stray from defined steps in the company's progressive discipline policy); *Rainey v. McWane, Inc.*, 552 F. Supp. 2d 626, 630 (E.D. Tex. 2008) (finding that production supervisors who could not discipline their employees and, instead, could only prepare a "Disciplinary Action" notice to Human Resources for review and further action were exempt executives because they played a sufficiently important role in the employee discipline

process even though they were not capable of directly disciplining the employees).

To find otherwise, and require a supervisor to have ultimate authority in order to satisfy the executive exemption, would essentially eliminate the exemption altogether. *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 619 (8th Cir. 1991) ("a manager . . . has management as his or her primary duty even though the discretion . . . may be limited by the company's desire for standardization and uniformity"); *see also* 29 C.F.R. § 541.704 (recognizing that a supervisor's use of manuals or guidelines does not alter his exempt status). Indeed:

> If final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee under the regulations. A president or chief executive officers of a company could say that he does not have final decision-making authority because he is only authorized to carry out the policies set by the board of directors, and the board of directors is free to review and veto his decisions.

*Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 867-68 (N.D. Tex. 2011).

### 4. Plaintiff's Compensation Significantly Exceeded That of His Subordinates

Plaintiff supervised approximately a dozen non-exempt associates who performed manual labor, such as material handlers, line runners and catchers, as well as a planner and job checker. 56.1, ¶¶ 19-26. For the last few years of his employment, Plaintiff also supervised a line lead to whom he could delegate some of his supervisory tasks. 56.1, ¶ 27. In evaluating a supervisor's exempt status, courts will examine and compare the compensation paid to the exempt supervisor and the employees who report to him. 29 C.F.R. § 541.700(a). During the relevant time period, employees who reported to Plaintiff were paid on an hourly rate which amounted to substantially less than Plaintiff's annual earnings of approximately $80,000 or nearly ($40 per hour), such as a line catcher whose typical starting rate was $8.99 per hour (or $18,699.20 per year assuming a 40-hour workweek). 56.1, ¶ 29. Meanwhile, a material handler

who brought loose product to the assembly line or took bottled products away from the assembly line typically earned $10.04 per hour (or $20,883.20 annually), a line runner who worked on the packaging line earned approximately $11.21 per hour (or $23,316.80 annually), and a quasi-supervisory lead earned approximately $12.02 per hour (or $25,001.60 annually).  *Id.*

If Plaintiff worked more than the scheduled 45 hours per week, which he rarely did, he was rewarded with an additional hour of straight pay for every hour worked in excess of 45 hours.  56.1, ¶ 66.  This further ensured that a supervisor continued to be compensated at a level far in excess of his subordinates in the unlikely event that he was required to work many additional hours.  By way of example, assuming an $80,000 annual salary, a supervisor who worked beyond 45 hours would be paid more than $38 per hour beyond the 45 hours, while a subordinate earning $9 per hour would only receive $13.50 per hour as overtime compensation if required to work beyond 40 hours (which equates to approximately one third of Plaintiff's hourly rate for additional hours worked).  A review of these figures clearly demonstrates that NBTY placed far greater value on the functions performed by Plaintiff than those he supervised, and further substantiates that Plaintiff was properly classified as a *bona fide* executive.  *See*, *e.g.*, *Amash*, 24 F. Supp. 3d at 222 (finding that the plaintiff made sufficiently more than her subordinates where she earned $17.92 per hour plus potential bonus wages, and the average hourly rate for the sales associates and department supervisors reporting to her were $12.64 and $16.97, respectively).

### C.   PLAINTIFF CUSTOMARILY AND REGULARLY DIRECTED THE WORK OF TWO OR MORE OTHER EMPLOYEES

A *bona fide* executive must customarily and regularly direct the work of two or more other employees.  29 C.F.R. § 541.100(a)(3).  At all times relevant, Plaintiff supervised numerous other employees, including line runners and catchers, material handlers, a planner, a

21

job checker, and, at a certain point, a line lead.  56.1, ¶¶ 19-27.  Plaintiff estimates that he supervised an average of 12-15 employees necessarily demonstrating that NBTY has satisfied this element of the executive exemption.  56.1, ¶ 19.

**D.**   **PLAINTIFF'S SUGGESTIONS AND RECOMMENDATIONS AS TO HIRING, FIRING, ADVANCEMENT, PROMOTION AND/OR OTHER EMPLOYEE STATUS CHANGES WERE GIVEN PARTICULAR WEIGHT**

*Bona fide* executives must have the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees, must be given particular weight.  29 C.F.R. § 541.100(a)(4).  NBTY does not contend that Plaintiff had direct authority to hire or fire permanent associates.  However, there is no plausible dispute that Plaintiff made recommendations and took other actions that directly impacted the employment status of permanent associates, and even made unilateral decisions to terminate the engagement of temporary workers.  56.1, ¶¶ 35, 37, 54-58, 60; Ex. 20.

The DOL regulations provide that the factors to be considered when assessing the hire-or-fire factor "include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  29 C.F.R. § 541.105.  Notably, an "employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105.

The packaging supervisor job description makes clear that an employee in this position "supervises, counsels and coaches associates" and is responsible for filing reports, including

"probation" reports which assess whether an associate has satisfactorily completed his or her probationary employment.  Ex. [3].  To perform these tasks, Plaintiff was necessarily required to weigh in on whether associates should be hired, fired, advanced through probationary status, or promoted.  56.1, ¶¶ 35, 37, 54-58, 60; Exs. 17, 18, 21, 24.  For example, Plaintiff made recommendations to hire temporary employees ("Please, we need to hire her or we will lose ANOTHER good temp").  Ex. 21.  Plaintiff also "added a temp to the lines to properly execute and attaine [sic] the company goals".  Ex. 28.  For employees whom he felt were performing well, Plaintiff made recommendations to recognize them through the Company's Employee of the Month program.  56.1, ¶ 55; Ex. 18.

Plaintiff also used his independent judgment and discretion to determine whether a new employee should pass probation.  If Plaintiff felt a new employee was not fit for the position then he completed a probationary evaluation form documenting the associates' deficiencies and explained his recommendation to terminate the employee.  56.1, ¶ 35; Ex. 17.  For example, Plaintiff explained his reasoning for having a probationary employee terminated as:

> Not putting enough effort in her job.  Too many complaints about
> her being lazy.  There has been two separate complaints about
> Rebecca touching another associate inappropriately.  Terminated.

Ex. 17.  Plaintiff weighed in on the termination of permanent employees, including the imposition of progressive discipline which could lead to termination.  56.1, ¶¶ 56-58; Ex. 16.  Plaintiff also took action in response to employees who failed to perform at an acceptable level and even unilaterally terminated the engagement of temporary employees.  56.1, ¶ 60.  For example, Plaintiff contacted NBTY's temp agency to advise: "[w]e need a replacement for Christina ASAP.  She worked here today (her first day) but she will not be a good fit for us", a decision he alone made.  56.1, ¶ 60; Ex. 20.

Plaintiff need not have final authority to be exempt.  *See Scott*, 2011 WL 1204406, at *15

(only being able to recommend suspensions was sufficient to satisfy the final prong of the executive exemption) (citing *Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp. 2d 1010, 1016 (E.D. Mich. 2005) (supervisors' suggestions and recommendations were given "particular weight" where they initiated the progressive discipline process)).[4]   Rather, courts apply this element of the duties test in a flexible manner, recognizing a variety of actions taken by managers that ultimately impact their subordinates' employment status in a concrete and tangible way.  *See Garrison v. Conagra Foods Packaged Foods, LLC*, No. 12-cv-00737, 2015 WL 366431, at *10 (E.D. Ark. Jan. 6, 2015) (assessing whether to retain probationary employees is a way in which an employee may meet the executive exemption).  In the instructive *Garrison* case, the plaintiffs were team leaders in a 24-hour manufacturing setting who oversaw one or more production lines that were manned by hourly employees.  *Id*. at *3–5.  These team leaders provided the primary oversight of new associates during their probationary period and recommended whether these new associates should pass probation.  *Id*. at *25–26.  The court held that the employer's reliance upon team leader recommendations regarding probationary employees satisfied the regulatory requirement that an executive's suggestions as to hiring and firing be given particular weight.  *Id*. at *29 (citations omitted).

Here, Plaintiff was critically involved in whether associates passed through probation or were terminated, which is illustrative of the impact his opinions had on the employment status of his subordinates that this element of the exempt test is seeking to validate.   Plaintiff also terminated temporary employees and made recommendations as to the employment status of performance employees.  There can be no reasonable dispute of fact that NBTY has satisfied this

---

[4]     *See also Calvo v. B&R Supermarket, Inc.*, 63 F. Supp.3d 1369, 1386 (S.D. Fla. 2014) ("the fact that Plaintiff followed Defendant's guidelines in conducting employee intake interviews and providing her recommendations does not diminish her managerial role.").

element of the exemption duties test.

## CONCLUSION

Based on the foregoing, NBTY's motion for summary judgment should be granted in full and Plaintiff's Amended Complaint dismissed with prejudice.  As a packaging supervisor, Plaintiff was properly classified as *bona fide* executive exempt from the payment of overtime wages under the FLSA or NYLL.  The undisputed record evidence, including Plaintiff's job description, resume and other documentary evidence, along with his own deposition testimony, establishes that he was responsible for managing the operations of his discrete unit and, in particular, the direct supervision of at least a dozen non-exempt workers.  The record makes clear that Plaintiff: directed, counseled, trained, evaluated, monitored and disciplined his team; maximized efficiencies of his departments; and made discretionary determinations for the success of the business.  The value of Plaintiff's managerial contributions is plainly reflected by his $83,856 salary, which far exceeds the $8.99 hourly rate of his subordinates.  When viewing the totality of the circumstances, it is apparent that Plaintiff was a *bona fide* executive and judgment should be entered in NBTY's favor based upon the executive exemption.

Date:   March 15, 2016
      Melville, New York

*s/ Kelly C. Spina*
Amy Ventry-Kagan
Kelly C. Spina
**LITTLER MENDELSON, P.C.**
290 Broadhollow Road, Suite 305
Melville, New York 11747
(631) 247-4700
aventry@littler.com
kspina@littler.com
*Attorneys for Defendant*

25